## Teachers' Tenure Act Cases.

214

Argued January 3, 1938. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

216

J. K. *Spurgeon*, for appellants, in No. 179.

C. W. *Martin*, filed a brief for appellee, in No. 179.

*John E. Evans, Sr.*, of *Pugliese & Evans*, for interested parties, under Rule 61, in Nos. 179, 3 and 5.

*John B. McGurl*, with him *Cyril C. Kilker* and *Cletus C. Kilker*, for interested party, under Rule 61, in No. 179.

*Clement J. Clarke, Jr., Joseph S. Conwell, Jr.*, and *Pepper, Bodine, Stokes & Schoch*, filed a brief for interested party, under Rule 61, in No. 179.

*Abraham Koppelman* and *Wesley Hurst Caldwell*, filed a brief for interested party, under Rule 61, in No. 179.

*Robert von Moschzisker*, filed a brief for interested party, under Rule 61, in No. 179.

*George D. Wick*, of *Campbell, Wick, Houck & Thomas*, with him *George H. Frich, Vincent R. Smith* and *George Walter Smith*, for appellants, in No. 3.

*James Gregg*, of *Gregg & Copeland*, with him *Frank Whitsett* and *Nicholas Polkabla*, of *Polkabla & Whitsett*, and *W. J. McDowell*, for appellee, in No. 3.

*Crowell & Whitehead,* filed a brief for appellants, in No. 5.

*Carroll Caruthers* and *Alex McConnell,* filed a brief for appellee, in No. 5.

*Russell J. Esler,* filed a brief for appellants, in No. 10.

*S. M. Hazlett,* of *Hazlett, Gannon & Walter,* filed a brief for appellee, in No. 10.

*M. J. Martin,* with him *James W. Scanlon* and *Esdras F. Howell,* for appellants, in Nos. 349 and 350.

*Joseph P. Brennan,* for appellees, in Nos. 349 and 350.

*L. B. Maxwell* submitted a brief for appellants, in No. 351.

*William C. Johnston, Harold G. Teel* and *R. S. Hemingway,* filed a brief for appellants, in No. 366.

*C. E. Kreisher,* filed a brief for appellee, in No. 366.

*G. W. Moon,* filed a brief for Bloomsburg School District, in No. 366.

*Charles J. Margiotti,* Attorney General, with him *Edward Friedman,* Deputy Attorney General, and *H. Thompson,* Special Deputy Attorney General, for Commonwealth.

OPINION BY MR. CHIEF JUSTICE KEPHART, January 31, 1938:

The Teachers' Tenure Act, No. 52, of the General Session of 1937, was approved April 6, 1937, P. L. 213, by the Governor; it amended certain important sections of

the Act of May 18, 1911, P. L. 309, and its supplements.[1]
Section 1 of the Tenure Act amended section 1201 by de-

[1] "Section 1201. The board of school directors in every school district in this Commonwealth shall employ the necessary qualified teachers to keep the public schools open in their respective districts in compliance with the provisions of this act."

(Act of May 18, 1911, P. L. 309, Section 1201.)

"Section 1205. In school districts of the second, third, and fourth class, all contracts with teachers shall be in writing, in duplicate and shall be executed on behalf of the board of school directors by the president and secretary and signed by the teacher.

"After the thirtieth day of June, one thousand and nine hundred and twenty-nine, each board of school directors or board of public education in school districts of the second, third, and fourth class in this Commonwealth shall enter into contract, in writing, with all teachers, supervisors, supervising principals, and principals employed by them, and said contract shall contain the following:

" 'IT IS AGREED BY and between ——————, Teacher, and the Board of Directors of the school district of ——————, Pennsylvania, that said teacher shall, under the authority of the said board and its successors, and subject to the supervision and authority of the properly authorized superintendent of schools, teach in the said school district for a term —————— months, for an annual compensation of $——————, payable monthly, or semimonthly during the school term, less the contribution required by law to be paid to the Teachers' Retirement Fund.

" ' This contract is subject to the provisions of the act, approved the eighteenth day of May, one thousand nine hundred and eleven (Pamphlet Laws, three hundred nine), entitled "An act to establish a public school system in the Commonwealth of Pennsylvania, together with the provisions by which it shall be administered, and prescribing penalties for the violation thereof; providing revenue to establish and maintain the same, and the method of collecting such revenue; and repealing all laws, general, special or local, or any parts thereof, that are or may be inconsistent therewith," and the amendments thereto, and to such regulations as the Board of School Directors of this district may impose consistent with the said act.

" 'AND IT IS FURTHER AGREED by the parties hereto that this contract shall continue in force year after year, with the right of the Board of Education, or the Board of School Directors to increase the compensation over the compensation herein stated, from time to time, as may be provided under the provisions and

fining "professional employees" of the school district.[2]
Section 2 provides that all school districts shall, within
30 days after the enactment of the law, tender to all
such professional employees, then "employed," new con-
tracts drawn in accordance with a form therein pre-
scribed.[3] The new contract differs materially from the

proper operation of the established salary schedule, if any, for the
school district, or to change said salary subject to the provisions of
law without invalidating any other provision of this contract, un-
less terminated by the teacher at the close of the school term by
written resignation presented sixty days before the close of said
school term, or by the Board of School Directors by official writ-
ten notice presented to the teacher sixty days before the close of
the school term.'"

(Act of May 18, 1911, P. L. 309, Section 1205, amended by the
Act of May 7, 1929, P. L. 1576, Section 1, and amended by the
Act of May 29, 1931, P. L. 243, Section 26.)

"Section 1205 A. The salary of any teacher, principal, super-
visor, district superintendent, or assistant district superintendent
in any of the school districts of the Commonwealth may be in-
creased at any time during the term for which such person is em-
ployed, whenever the board of school directors of the district deems
it necessary or advisable to do so."

(Act of May 18, 1911, P. L. 309, as amended by Act of May 23,
1919, P. L. 261, section 1; Act of April 5, 1921, P. L. 92, section
1; Act of May 7, 1929, P. L. 1576, section 2.)

[2] The section as amended reads: "Section 1201. The Board of
School Directors in every school district in this Commonwealth
shall employ the necessary qualified teachers to keep the public
schools open in their respective districts in compliance with the
provisions of this act.

*"The term 'professional employee,' as used in this act, shall in-
clude teachers, supervisors, supervising principals, principals, direc-
tors of vocational education, dental hygienists, visiting teachers,
school secretaries the selection of whom is on the basis of merit as
determined by eligibility lists, school nurses who are certified as
teachers and any regular full-time employee of a school district
who is duly certified as a teacher."*

[3] Amending Section 1205. The amendment reads: "Section
1205. In all school districts, all contracts with *professional em-
ployees* shall be in writing, in duplicate, and shall be executed on
behalf of the Board of School Directors *(or Board of Public Edu-*

previous agreement in several particulars. The old contract provided for renewal from year to year unless terminated by either party at the end of any term, by

cation) by the president and secretary and signed by the *professional employee.*

"Each Board of School Directors or Board of Public Education in all school districts in this Commonwealth shall, *within thirty days after the effective date of this act,* enter into contract, in writing, with all *professional employees now* employed by them, *and thereafter shall in the same manner enter into contracts, in writing, with each professional employee at or before the time the employee first enters the service of the district. Said contracts* shall contain *only* the following:

" 'IT IS AGREED BY and between . . ., *Professional Employee,* and the Board of Directors *(or Board of Public Education)* of the school district of . . ., Pennsylvania, that said *professional employee* shall, under the authority of the said board and its successors, and subject to the supervision and authority of the properly authorized superintendent of schools *or supervising principal,* teach in the said school district for a term *of* . . . months, for an annual compensation of $———, payable monthly or semimonthly during the school term *or year,* less the contribution required by law to be paid to the Teachers' Retirement Fund, *and less other proper deductions for loss of time.*

" 'This contract is subject to the provisions of the act, approved the eighteenth day of May, one thousand nine hundred and eleven (Pamphlet Laws, three hundred nine), entitled "An Act to establish a public school system in the Commonwealth of Pennsylvania, together with the provisions by which it shall be administered, and prescribing penalties for the violation thereof; providing revenue to establish and maintain the same, and the method of collecting such revenue; and repealing all laws, general, special or local, or any parts thereof, that are or may be inconsistent therewith," and the amendments thereto.

" 'AND IT IS FURTHER AGREED by the parties hereto *that none of the provisions of this act may be waived, either orally or in writing, and* that this contract shall continue in force year after year, with the right of the Board of School Directors *(or Board of Public Education)* to increase the compensation over the compensation herein stated, from time to time, as may be provided under the provisions and proper operation of the established salary schedule, if any, for the school district, subject to the provisions of law without invalidating any other provision of this contract.

60 days' written notice. The school board could terminate it without cause. The new Act permits *termination* of the contract only for certain valid causes.[4] It provides for public hearings before the board, and an appeal to the court of common pleas by the employee.[5]

The Act, in Section 6, further provides that any contract then "in effect" shall not be terminated by the school boards except in accordance with its provisions,[6] and it forbids, in Section 3 amending Section 1205-A of the Code, the demotion of any professional employee either in salary or position without his consent or, if that is refused, notice and hearing subject to appeal.[7]

---

unless terminated by the *professional employee* by written resignation presented sixty days before *resignation becomes effective,* or by the Board of School Directors *(or Board of Public Education)* by official written notice presented to the *professional employee: Provided, That the said notice shall designate the cause for the termination and shall state that an opportunity to be heard shall be granted if the said professional employee, within ten days after receipt of the termination notice, presents a written request for such a hearing.'"

[4] Section 2, subsection (a): *"The only valid causes for termination of a contract in accordance with the provisions of this section shall be—Immorality, incompetency, intemperance, cruelty, wilful and persistent negligence, mental derangement, persistent and wilful violation of the school laws of this Commonwealth on the part of the professional employee, or substantial decrease in the number of pupils or students due to natural causes. Nothing within the foregoing enumeration of causes, however, shall be interpreted to conflict with the retirement of professional employees upon proper evidence of disability, or the election by professional employees to retire during the period of voluntary retirement, or the compulsion on the part of professional employees to retire at the attainment of age seventy."*

[5] Section 2, subsections (c) to (j).

[6] "Section 6. No Contract in effect at the enactment of this act shall be terminated, except in accordance with the provisions of this act."

[7] The section as amended reads: "Section 1205-A. The salary of any district superintendent, assistant district superintendent *or*

It will be seen, therefore, that the principal changes made by the Teachers' Tenure Act not only preserve the contractual status of teachers in new contracts but place emphatic limitations on their removal and demotion. The purpose of the Act is to preserve the system of employment in the educational field free from any interference, and by that action it takes away the heretofore discretionary power of school boards to oust employees without cause.

Prior to the adoption of the Teachers' Tenure Act, various of the school boards throughout the State gave to many teachers the sixty days' notice required by the School Code of 1911, as amended, terminating their contracts at the end of the school year 1936-1937. These teachers having been denied contracts under the Tenure Act, instituted mandamus proceedings to compel the school boards to execute the new contracts as provided in Section 2. The courts below held that as the school boards were given no discretion in the execution of these contracts, mandamus was unquestionably the proper proceeding to compel the school directors to perform their statutory duty. This conclusion was correct: *Kaine et al., School Directors, v. Commonwealth ex rel. Manaway,* 101 Pa. 490; *Commonwealth ex rel. Short v. Woodward,* 84 Pa. Super. Ct. 124; *Commonwealth ex rel. Middleton v. Commissioners of Allegheny County,*

---

other professional employee as defined in this act in any of the school districts of the Commonwealth may be increased at any time during the term for which such person is employed, whenever the Board of School Directors *(or Board of Public Education)* of the district deems it necessary or advisable to do so, *but there shall be no demotion of any professional employee, either in salary or in type of position, without the consent of the same employee, or if such consent is not received, then such demotion shall be subject to the right to a hearing before the Board of School Directors (or Board of Public Education), and an appeal in the same manner as hereinbefore provided in the case of the dismissal of a professional employee.*"

37 Pa. 237; High, Extraordinary Remedies (2d ed., 1884), Sections 13, 41.

Appellants opposed the issuance of writs of peremptory mandamus chiefly on the ground that the Teachers' Tenure Act is unconstitutional and because appellees, having received notice of termination, were not within its scope. The courts below overruled all objections and in each case ordered the writ of mandamus to issue, to compel appellants to execute new contracts with appellees for the ensuing school year.

In the appeals before us the argument has taken a wide range. The principal constitutional objections urged against the Tenure Act are that it violates Article I, Section 17,[8] relating to the impairment of the obligations of contract, and that it abridges the right of future legislatures to enact appropriate laws in the exercise of the governmental function as prescribed by Article X, Section 1.[9] These two objections may well be discussed together, but before doing so, it will be necessary to review the position of public education in our form of government.

We had occasion to discuss the origin of our present public school system in *Wilson v. School Dist. of Philadelphia*, 328 Pa. 225, 195 A. 90. The Constitution of Pennsylvania, by Article X, Section 1, not only recognizes that the cause of education is one of the distinct obligations of the State, but makes of it an indispensable governmental function. The power of the State over education thus falls into that class of powers which are made fundamental to our government. In the ab-

---

[8] Article I, Section 17: "No ex post facto law, nor any law impairing the obligation of contracts, or making irrevocable any grant of special privileges or immunities, shall be passed."

[9] "The General Assembly shall provide for the maintenance and support of a thorough and efficient system of public schools, wherein all the children of this Commonwealth above the age of six years may be educated, and shall appropriate at least one million dollars each year for that purpose."

stract it is not an absolute essential to government as taxation, law enforcement and preservation of the peace are essential, but by the express provision of the Constitution it ranks with them as an element necessary for the sustenance and preservation of our modern State. Education is to-day regarded as one of the bulwarks of democratic government. Democracy depends for its very existence upon the enlightened intelligence of its citizens and electors. When the people directed through the Constitution that the General Assembly should "provide for the maintenance and support of a thorough and efficient system of public schools," it was a positive mandate that no legislature could ignore. The power over education is an attribute of government that cannot be legislatively extinguished. It cannot be bargained away or fettered. Its benefits to a free government cannot be placed on the auction block or impeded by laws which will ultimately weaken, if not destroy, the underlying constitutional purpose. To permit such legislative incursion would relegate our State back to the days when education was scarce and was secured only through private sources, as a privilege of the rich.

In considering laws relating to the public school system, courts will not inquire into the reason, wisdom or expediency of the legislative policy with regard to education, but whether the legislation has a reasonable relation to the purpose expressed in Article X, Section 1, and whether the fruits or effects of such legislation impinge the Article by circumscribing it, or abridging its exercise by future legislatures within the field of "a thorough and efficient system of public schools." So implanted is this section of the Constitution in the life of the people as to make it impossible for a legislature to set up an educational policy which future legislatures cannot change. The very essence of this section is to enable successive legislatures to adopt a changing program to keep abreast of educational advances. The people have directed that the cause of pub-

lic education cannot be fettered, but must evolute or retrograde with succeeding generations as the times prescribe. Therefore all matters, whether they be contracts bearing upon education, or legislative determinations of school policy or the scope of educational activity, everything directly related to the maintenance of a "thorough and efficient system of public schools," must at all times be subject to future legislative control. One legislature cannot bind the hands of a subsequent one; otherwise we will not have a thorough and efficient system of public schools. What greater or more potent influence operates upon the execution of Article X, Section 1, or stands within a more direct line of its exercise than legislation concerning the school teachers, their qualifications, term and compensation? Legislatures must at all times be free to act with respect to these.

Therefore, while the legislature has set up in the new Act a tenure system for teachers and has provided for their qualifications, compensation and contracts, all of these provisions, and the contracts themselves, have written into them by implication from the Constitution a distinct understanding that subsequent legislation may change, modify or abolish the existing features of the school system of the teachers' contracts. This determination flows from the fact that if the Constitution is to be operative at all times, we cannot restrict it so that it becomes stagnant, and expose it to future ruin by so doing. For these reasons, appellants' objection that the Teachers' Tenure Act abridges the power of future legislatures falls, because a subsequent legislature may abolish this Act, in toto, if it deems it necessary to do so under Article X, Section 1. And such future action can, for the same reason, be taken without producing an impairment of the obligations of the contracts for which the new Act provides because the Constitution only permits such contracts to be made subject to the right of change or regulation by future legislatures.

This rule also applies to contracts entered into under the prior School Code.

This principle is similar to that applied to other contracts affected with a public interest, which are considered to be made in contemplation of the police power of the State to protect the health, morals and safety of its citizens. See *Leiper v. Balto. & Phila. R. R. Co.*, 262 Pa. 328; *Statler v. United States Savings & Trust Co.*, 326 Pa. 247. And see, under the constitutional power of Congress over the currency, the decisions of the Federal Supreme Court on the gold clause: *Norman v. B. & O. R. R. Co.*, 294 U. S. 240; *Nortz v. United States*, 294 U. S. 317. In *Home Building & Loan Assn. v. Blaisdell et al.*, 290 U. S. 398, at 435, it was said: "Not only are existing laws read into contracts in order to fix obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order." Even if no mention were made in these contracts of the reserved power in the legislature to alter the school laws, it would be deemed to exist by essential implication.

In the argument it was suggested that contracts did not legally exist between schoolteachers and school boards. In other jurisdictions, various conclusions have been reached upon the question of whether they occupy a contractual status, depending in each case upon the statute involved. See *State ex rel. O'Neil v. Blied*, 188 Wis. 442, 206 N. W. 213; *Gastineau v. Meyer*, 131 Cal. App. 611, 22 P. (2d) 31; *State ex rel. Anderson v. Brand*, 5 N. E. (2d) 531, 7 N. E. (2d) 777; *Phelps v. Board of Education of West New York*, 300 U. S. 319.[9a] It is useless to say that the schoolteachers do not have

---

[9a] In the last case cited, the Federal Supreme Court, affirming the New Jersey appellate courts, held that teachers of that State had a legislative status as governmental employees, though they possessed some incidental contractual rights. The law under consideration in that case, permitting a reduction of salary, was held merely a governmental regulation.

contracts of employment. They have contracts, express-
ly so denominated by the legislature. They are so in
substance and form. Actions in assumpsit by school-
teachers for the enforcement of contractual rights have
been recognized: *Costello v. School Dist.*, 241 Pa. 179;
see *Potts v. Penn Township School Dist.*, 127 Pa. Super.
Ct. 173. In this respect the teachers differ from other
governmental employees who hold their position solely
by tenure of appointment, without express contractual
rights. For example, as to employees of this latter type,
it was held in *Retirement Board v. McGovern*, 316 Pa.
161, that they have no right to complain of the adoption
by the legislature of a retirement plan requiring them
to contribute a portion of their stated salary, because
they have no contract for compensation with the State
which is being impaired.[10]

---

[10] The question of whether rights conferred by statute upon gov-
ernmental employees can be enforced as contract rights against the
State was recently discussed by the United States Supreme Court
in the case of *Dodge v. Board of Education*, 302 U. S. 74. In that
case Mr. Justice ROBERTS held that school teachers had no contrac-
tual rights to recover a pension created by an Illinois statute (the
Miller Act). The opinion stresses the fact that the legislature did
not contemplate the making of a contract, either oral or written,
and intended the pension as a gratuity. The fund from which the
pension was to be paid was contributed entirely by the State from
taxation and not assisted by contribution from the salaries of the
teachers. The court said that regardless of the fact that the fund
from which the payments were to be made was denominated a re-
tirement fund, and the payments were referred to as annuities,
this feature made it purely a pension to which the teacher had no
contractual or vested rights. Care must be taken to distinguish
this case from *Retirement Board v. McGovern*, 316 Pa. 161, where
we held that retirement pay was not a pension where an employee
pays into the fund by deductions from his salary and the govern-
ment supplies the balance. There, the legislative engagement to
make retirement payments was a contract that could not be im-
paired by subsequent laws. A contributor to a retirement fund
has a fixed contractual status and vested rights that cannot be de-
stroyed. The *Dodge* case expressly does not apply to retirement pay
made up partially from the contributions of employees.

But the contract which the school teachers have with the State is a qualified contract. It is subject to delimitation of its operation by subsequent statutory changes. When a state enters into contracts with private individuals for the performance of services as independent contractors, or for the loan of funds incidental to the carrying out of a governmental function, these contracts are protected against impairment by subsequent legislation. Thus city bondholders can object to the impairment of their contracts by the municipality or the legislature: *Western Saving Fund Society v. City of Philadelphia,* 31 Pa. 185; and see *Duane v. Philadelphia,* 322 Pa. 33, 37. These, to a degree, partake of the nature of business or proprietary contracts. For example, municipal governments, acting in their governmental capacity, provide police and firemen to protect the safety and property of their citizens. The employment of these men is in the direct exercise of the governmental function and the employees are within the immediate path of its operation. In performing their services they represent the government and exercise a portion of its powers. But when a municipality contracts for the erection of a fire house or police station, the contractor is doing something which is merely auxiliary to the exercise of a governmental function. He neither represents the municipality, nor exercises municipal power. The contract which the municipality makes with the building contractor cannot be abrogated either by the municipality or the legislature. The policemen and firemen, on the other hand, are not in a position to object to a change of their status by subsequent enactments. All rights which such employees may possess flow from the governmental power, here Article X, Section 1, and are taken subject to its future exercise.

The legislature, in providing by the Act of 1929 the form of contract to be executed by the teacher, expressly recognized its qualified nature by including the proviso that it was to be subject to the provisions of the Act of

1911 "and the amendments thereto."[11] And the same provision is in the Act of 1937.[12] The language of these clauses is broad enough to include future amendments as well as those existing at the time the contracts were entered into, and it indicates the intention of the parties to submit their relationship to legislative change. The Act of 1937 itself is such an amendment.

School boards have no vested or property interests in contracts under the Act of 1929 as continuing or permanent contracts or through the termination notice given. Their interest is limited solely to that prescribed by the Act which may be ended by future legislation.

The Teachers' Tenure Act will work no injury to taxpayers by preventing the dismissal of members of the teaching personnel for purposes of economy, and by preserving intact in the future the present teaching staff of each school district. No citizen has a constitutional right to be protected from increased taxation. If the legislature deems that a more costly system of education is necessary, it may impose an increase in the exercise of its constitutional powers.[13] The courts cannot, at the suit of a taxpayer, compel it to alter such policy. The Teachers' Tenure Act does not work an impairment of contract and if a taxpayer has any rights in the enforcement of the old agreements, these rights, like those of the parties themselves, are subject to the express contractual provision that the legislature should be free to change or alter it at will.

Appellants have also contended that the Teachers' Tenure Act violates Article I, Section 24, of the State Constitution,[14] relating to the creation of an office for a

---

[11] See Section 1205, footnote 1, supra.

[12] Section 2, footnote 3, supra.

[13] See 1 Cooley, Taxation (4th ed.), 1924, Sec. 72; *People v. Board of Review,* 290 Ill. 467, 125 N. E. 274, and see *Stewart Dry Goods Co. v. Lewis,* 294 U. S. 550, 562.

[14] "The legislature shall not . . . create any office the appointment to which shall be for a longer term than during good behavior."

term longer than good behavior; Article III, Section 13,[15] forbidding the extension of the term of any public officer after his election or appointment; and Article VI, Section 4,[16] relating to the removal of appointive officers.

These objections are answered by our conclusions on the main questions. The Teachers' Tenure Act does not create a term longer than good behavior, nor does it extend the term of any teacher, and even if it did so there would be no conflict with these sections of the Constitution, because schoolteachers are not public officers. In *Commonwealth v. Sulzner*, 198 Pa. 502, we held that the treasurer of a school board was such an officer, under Article VI, Section 4: *Muir v. Madden*, 286 Pa. 233. A board secretary is a public officer: *Howell v. Keeler*, 5 D. & C. 90. *Weiss v. Zeigler*, 327 Pa. 100, indicates that a district superintendent has the same status, but the legislature in creating that office provided how the pleasure of the removing power should be exercised; that is, by proceedings for unfitness. In *Foyle v. Commonwealth*, 101 Pa. Super. Ct. 412, an assistant superintendent of schools was held to be a public officer.

On the other hand, the duties of the schoolteachers are not defined or created by statute, but arise directly from the contract of hiring entered into by them with the school board.[17]

---

[15] "No law shall extend the term of any public Officer, or increase or diminish his salary or emoluments, after his election or appointment."

[16] "All officers shall hold their offices on the condition that they behave themselves well while in office, and shall be removed on conviction of misbehavior in office or of any infamous crime. Appointed officers, other than judges of the courts of record and the Superintendent of Public Instruction, may be removed at the pleasure of the power by which they shall have been appointed. . . ."

[17] See *Kosek v. Wilkes-Barre Township School Dist.*, 110 Pa. Super. Ct. 295. For the decisions on this question in other States see: *Martin v. Fisher*, 108 Cal. App. 34, 291 Pac. 276; *State v. Preston*, 120 Wash. 569, 208 Pac. 47; *State v. Blied*, supra; *Kos-*

Teachers are not officers who may be removed at the pleasure of the school board under Article VI, Section 4, and the legislature has the power to provide for removal of such employees for cause only. Even under Article VI the legislature may attach conditions to the tenure. The Act does not violate the sections of the Constitution referred to.

The Teachers' Tenure Act was designed to secure to the citizens of Pennsylvania a competent and efficient school system by preventing dismissal of capable teachers without just cause. It is clear that the legislature did not intend, as appellants contend, that the Act should confer any special privileges or immunities upon the teachers themselves to retain permanently their positions regardless of merit or the future policy of the legislature as to their employment.

Appellants further argue that the Act of 1937 violates the constitutional inhibition in Article III, Section 7, against the passage of any special law "regulating the management of public schools. . . ." It is alleged that the Act is special in that it relates only to certain designated members of a class and does not apply to others within the same classification. The Act, by Section 1, applies only to "teachers, supervisors, supervising principals, principals, directors of vocational education, dental hygienists, visiting teachers, school secretaries the selection of whom is on the basis of merit as determined by eligibility lists, school nurses who are certified as teachers and any regular full-time employee of a school district who is duly certified as a teacher," who are included in the designation "professional employ-

tanzer v. State, 205 Ind. 536, 187 N. E. 337; Mootz v. Belyea, 60 N. D. 741, 236 N. W. 358; Board of Education v. State, 100 Wis. 455, 76 N. W. 351; Heath v. Johnson, 36 W. Va. 782, 15 S. E. 980; Seymour v. Over-River School Dist., 53 Conn. 502, 3 Atl. 552; Spear v. Cummings, 23 Pick. (Mass.) 224; Murphy v. Bd. of Ed., 87 App. Div. 277, 84 N. Y. S. 380; Lander v. Seaver, 32 Vt. 114; Bd. of Ed. v. Bacon, 22 Ga. App. 72, 95 S. E. 753.

ees." Appellants insist that this classification is arbitrary in that it excludes certain other employees of the school district who perform full-time services, and those who perform professional services on a part-time basis. There is nothing unreasonable in grouping together for the purpose of legislation all the regular employees of the public schools who possess teachers' certificates, and those secretaries who are chosen from the eligibility lists. Each member of this group has, in common, selection for merit and continuity of appointment. Part-time teachers, and employees without teaching or eligibility qualifications, are clearly differentiated from the professional employees referred to by the Act, both from the standpoint of selection and duties. The classification is not arbitrary. The Constitution merely provides that classification be founded on real distinctions *(Seabolt v. Commissioners,* 187 Pa. 318, 323) fairly made; *Ayars's Appeal,* 122 Pa. 266, 281; *Mason-Heflin Coal Co. v. Currie,* 270 Pa. 221, 225.

The familiar objection is also presented that the title of the Teachers' Tenure Act[18] conflicts with the provisions of Article III, Section 3 of the State Constitution. The principal points in which the title is said to be defective are first, it does not expressly indicate that the Act repeals portions of the previous school legislation, and, secondly, it does not indicate that it deals with the *termination* of teachers' contracts. As to the

---

[18] "To further amend the act, approved the eighteenth day of May, one thousand nine hundred and eleven (Pamphlet Laws, three hundred nine), entitled 'An act to establish a public school system in the Commonwealth of Pennsylvania, together with the provisions by which it shall be administered, and prescribing penalties for the violation thereof; providing revenue to establish and maintain the same, and the method of collecting such revenue; and repealing all laws, general, special or local, or any parts thereof, that are or may be inconsistent therewith,' by defining professional employees, and providing for and regulating the employment, dismissal, suspension, and demotion of such employees, and providing for appeal to the court of common pleas."

true purpose of this constitutional provision see *Commonwealth v. Stofchek,* 322 Pa. 513, 518. This subject requires no extended discussion because it is obvious that the title of the Act sufficiently notifies all persons interested that changes are to be made in the School Code, as a whole, and anything germane to the existing laws is embraced by the title: *Luzerne Water Co. v. Toby Creek Water Co.,* 148 Pa. 568; *Goodwin v. City Council of Bradford,* 248 Pa. 453; *Page v. Suspender Co.,* 191 Pa. 511.

Appellants contend that the Tenure Act in its operation is a retroactive law. They insist that appellees, having been given notice their contracts terminated at the end of the current school year, were no longer employed by the school district, and to give them new contracts, under Section 2, would reinstate them by legislative action after proper dismissal. Appellants urge that the contracts of the Act of 1929 under which appellees were employed were *continuing* contracts, renewable from year to year unless notice to terminate was given, and when that notice was given they ceased to exist as such continuing contracts.

It is difficult to see how it can be contended that the Act of 1937 operates restrospectively in relation to appellees. It provides that a *new* contract shall be entered into with all professional employees of the school board within 30 days after its effective date. This is certainly a prospective provision. The teachers named by the Act to receive new contracts are those who were at the time of its enactment "now employed." The Act also prevents the termination of contracts then "in effect" except in accordance with its provisions. It does not compel the school board to restore to employment any teacher whose contract had been terminated prior to its adoption. Appellees were not in that position. They had received notice that their contract *would be terminated* at the end of the school year, but this did not immediately sever their contractual relationship with the

school district. Appellees were performing and did continue to perform, the same services at the same rate of remuneration under the provisions of their contracts until such time as the termination should become effective. They were "employed" within the meaning of the statute. Their contracts were still "in effect" because both parties were continuing to perform their duties under them, and were still legally bound by their terms. "In effect" means effective at the time named: *Lehigh & N. E. R. R. Co. v. Public Service Commission,* 277 Pa. 493.

Appellants' contention not only ignores the fact that the future date for termination had not arrived and therefore no change had been made in the contractual status of the parties, but it reads into the statute the word "continuing," which the legislature has omitted. The purpose of the Act was to substitute new contracts for those then existing and it was not meant to apply only to those which would have continued in effect the following year. In view of the broad purpose of the Act which is intended to provide the greatest measure of protection possible against dismissal of employees, it would be violative of that intent to imply this qualification, and superimpose it upon the otherwise perfectly clear meaning of the words used.

This law cannot possibly be termed an ex post facto law within the meaning of Article I, Section 17, of the State Constitution, not only because it has no retrospective effect, but also because that clause refers only to penal legislation. In *Statler v. United States Savings & Trust Co.,* supra, it was held that the Sordoni Act, even though retrospective, was not an ex post facto law within the meaning of the Constitution because it was not penal. And, in *Myers v. Lohr,* 72 Pa. Super. Ct. 472, it was said: "The term, ex post facto, as used in the Constitution of the United States and of this State is limited to penal statutes. . . ."

Certain of these appeals present individual questions, although all are governed by the foregoing principles of law.

MALONE *v.* HAYDEN ET AL., *Appellants.*

Appellee Malone was notified on March 18, 1937, that his contract as teacher would be terminated at the end of the school year. Appellants here contend that the prescribed form of the new contract is not workable, as it requires a professional employee to "teach," and is inapplicable to those other than teachers. Thus a dentist, in performing his duties at the school would not be teaching. It is insisted this is a serious problem as the Act prescribes the contract, the terms of which cannot be waived or modified by either party. The legislature did not intend those named in the Act as professional employees who were not teachers to contract to teach. A construction must be adopted that will make effective the legislative intent: *Commonwealth v. Shawell,* 325 Pa. 497, 503; *Grime et al. v. Department of Public Instruction,* 324 Pa. 371, 379. If it is necessary to correct the apparent ambiguity another word may be substituted for "teach" to conform to the duties the employee is to perform.

The official contract reads in part: "It is agreed . . . that said professional employee shall . . . teach in the said school district for a term of —————— months for the annual compensation of $—————— payable monthly or semimonthly during the school term or year. . . ." The Philadelphia Board of Education suggests that the blank number of months may be filled in to require employment for twelve months. This would entitle the board to have the services of its teachers during the entire year, regardless of the term that the schools were in session, and such services would be without any compensation for the months that the schools are not in session. This conclusion is contrary to the system of compensation established for schoolteachers from the origin of the public schools. Schoolteachers were always paid a stated sum for the services performed during the school term or school year, which was, in every case, less than twelve months, though in

some cases the salary was paid monthly during the calendar year. During the summer the teachers, though under contract to teach in the fall, were entitled to be paid for any other work they did or to additional compensation for any service they performed during this time. The proposed action of the Philadelphia Board of Education would deny this right and in effect reduce the salaries of its teachers by depriving them of the extra pay for services performed beyond the school term, or the right to earn it elsewhere. This invites future legislation to pay all teachers for those months that they are employed without additional compensation. It is not only inconsistent with the scheme or plan heretofore adopted by the legislature for compensation, but is contrary to Section 3 of the Tenure Act which protects teachers from a reduction in salary. Had such a change been intended the number of months of employment would not have been left blank in the contract, but instead the words "one year" or "twelve months" would have been used. Moreover the contract clearly indicates that it refers to the school term, and that the number of months was left blank by the legislature to give the contract sufficient flexibility to be adapted to the use of school districts whose school terms may differ from the standard term. Each school board can thus fill in the number of months which constitute its regular school session. When the legislature states that the provisions of the contract cannot be waived and shall continue in force and effect from year to year, it has reference to the specific terms of the contract as printed in the statute; the uncertain part of it, to wit, the school term, may be changed when necessary each succeeding year to conform to the educational policy. The term cannot, of course, be less than the number of days prescribed by law, except in case of emergency. If the school district increases the length of the regular school term, it would be proper to so provide in the contracts of the teachers. But, the school board cannot insert in the blank pro-

vided a period of months longer than the regular session without providing for compensation.

Some of the districts have not tendered contracts to the teachers, in the belief that the thirty-day period is directory and not mandatory. This is unimportant. If directory, it requires action within a reasonable time, and if mandatory, it obviously compels the school boards to execute such contracts as closely in compliance with the prescribed period as is possible under the circumstances. This is the better view to take of the provision. In *Dalzell v. Kane, et al.,* 321 Pa. 120, at 123, it was said: "When strict compliance with the terms of the written law is impossible, compliance as near as can be, under judicial sanction is allowed."

DITTY *v.* WEISS ET AL., *Appellants.*

Appellee Ditty had for some years performed the duties of coach to the high school football team, in addition to his duties as teacher of physical education, and, as a portion of his present salary was compensation for coaching, appellants urge he cannot receive a new contract as teacher, in the same amount. His contract for the school year 1936-1937 was that of "teacher," and the arrangement that he should coach part of the time was a "private understanding" not incorporated in the written agreement. The evidence does not show that appellee was a party to this understanding, but that it had merely been agreed by members of the school board that he should be assigned to coaching duties. He was a full-time employee, employed as a teacher, with a teachers' certificate, and is entitled to receive a new contract as a professional employee without salary decrease.

NORKUS *v.* BOARD OF DIRECTORS OF SCHOOL DISTRICT OF FRANKLIN TOWNSHIP, *Appellants.*

Notice was given appellee of the termination of her contract, to take effect at the end of the school year, and the board appointed another teacher as her successor.

It is claimed that the legislature cannot nullify the effect of the board's action in giving notice, as the new appointee would thereby be deprived of a position, or, if not, it would result in two teachers being employed for the same position. The situation, though unusual, is not difficult. It is of no moment to appellee that another teacher was appointed. Her contract was not only in effect when the Act was passed, but she was still working. She was included within its provisions. The newly-appointed teacher's rights are not before the court and cannot be determined in this proceeding.

SWICK *v.* BOARD OF SCHOOL DIRECTORS OF SCHOOL DISTRICT OF BOROUGH OF TARENTUM, *Appellants.*

This appellee was employed as a high school principal prior to the passage of the new Act. On June 19, 1936, he was notified by the school board that he had one year within which to find a new position or elect to stay at the end of that period as an ordinary teacher. He received, on March 9, 1937, a second notice from the board which reiterated he would not be retained as principal the following year, and gave him until March 26, 1937, to accept their offer of a teaching contract. On March 25th, one day before the expiration of this period of election, appellee applied to the school board for the teaching contract. The board did not meet to pass upon his application until after the passage of the Teachers' Tenure. Act, and he received no notification of appointment as teacher for the ensuing year until April 13, 1937. This notice concluded: "Formal acceptance of this election will be made by your signing the contract . . . within the next ten days." No contract was ever executed and appellee has notified the school board of his refusal to do so, demanding that they comply with the provisions of the Tenure Act by tendering him a new contract as principal. Appellants contend that his application for a contract as teacher constituted a waiver on his part of any rights under the principal's contract.

At the time that the Tenure Act was passed, appellee was employed as a principal. His contract had not terminated, nor had a new contract been entered into for the ensuing year. The last notice sent by the board to appellee was clearly an offer of a new contract requiring his acceptance in the manner indicated. It was never accepted by appellee, and consequently has no effect on the earlier contract. The mere appointment of appellee by the school board was not sufficient to create a contract for the ensuing year. See *In re Hawkins,* supra.

#### STORM v. SCHOOL DISTRICT OF BOROUGH OF MOSCOW, *Appellants.*

Appellants contend that appellee Storm was a supervising principal and therefore a public officer, removable at the pleasure of the appointive power. While the duties of a supervising principal are in many respects similar to those of a district superintendent, who has been held to be a public officer, the School Code makes a clear distinction between these two positions. Section 1214 of Article I, of the Act of 1911, provides that the board of school directors shall "employ" a supervising principal, whereas it is provided by Section 1133 of Article XI, that the school directors shall "elect" a district superintendent. The new Act recognizes the supervising principal as a member of the class of "professional employees." However, it appears from the record that appellee was employed by the school board under a written contract as "teacher," at the time of the passage of the Act. The fact that additional duties had been assigned to him does not alter his status under that contract for the purpose of determining his right to a new contract under the Teachers' Tenure Act.

In all of the appeals the decrees of the courts below are affirmed; costs to be paid by appellants; separate orders to be sent out in each case.